UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Richard Jenkerson</u>


        v.                              Civil No. 07-cv-217-PB

<u>Michael J. Astrue,</u>
<u>Commissioner, Social</u>
<u>Security Administration</u>



### <u>REPORT AND RECOMMENDATION</u>

    This action involves plaintiff Richard Jenkerson's third
application for social security disability ("SSD") benefits.
Jenkerson twice before applied for SSD benefits and was denied
both times, but did not seek further review of either denial.  He
then obtained counsel, applied again and was awarded benefits
with an onset date of May 1, 1998.  As part of this third
application for benefits, Jenkerson sought review of the two
prior denials, but the Commissioner declined to reopen those
earlier decisions.  The Commissioner found that Jenkerson had
failed to show a basis either for reopening or for extending the
time to request review based on mental incapacity, citing 20
C.F.R. § 404.988 and Social Security Ruling ("SSR") 91-5p.  The
Appeals Council declined to review that decision, rendering the

Commissioner's  denial the last action by the Social Security Administration ("SSA").  Jenkerson then commenced this action, seeking review of the Commissioner's decision not to reopen the prior two denials.  See 42 U.S.C. § 405(g) (Supp. 2008).  He claims the decision not to reconsider the prior applications violated his Fifth Amendment due process rights.

Defendant moved to dismiss Jenkerson's action for lack of subject matter jurisdiction since the refusal to reopen is discretionary and, therefore, not a final decision within the meaning of § 405(g) (document no. 4).  That motion was denied in part, because Jenkderson's complaint stated a colorable constitutional claim that his due process rights were violated when he failed to timely appeal the first two decisions due to his alleged mental incapacity.  See Jenkerson v. Astrue, Civ. no. 07-217-PB, slip op. at 7-8 (D.N.H. Sept. 30, 2008) ("Mot. to Dismiss Order").  Currently before the court is Jenkerson's motion to reverse or remand (document no. 14) and defendant's motion to affirm (document no. 16).  The matter was referred to me for a recommendation of disposition.  See 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Jenkerson's motion be granted and that the matter be remanded.

2

<u>Discussion</u>

**1.  Background**

Pursuant to this court's local rules, <u>see</u> United States District Court for the District of New Hampshire Rule 9.1(d), the parties filed a joint statement of facts which are part of the record and which I have reviewed.  Only those facts relevant to the disposition of this matter are discussed below, as needed.

**2.  Standard of Review**

An individual seeking social security benefits has a right to judicial review of a decision denying the application.  <u>See</u> 42 U.S.C. § 405(g) (Supp. 2008).  The court is empowered to affirm, modify, reverse or remand the decision of the Commissioner, based upon the pleadings and transcript of the record.  <u>See</u> <u>id.</u>  The factual findings of the Commissioner shall be conclusive, however, so long as they are supported by "substantial evidence" in the record.  <u>See</u> <u>Ortiz v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).  "Substantial evidence" is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938));

see also Currier v. Sec'y of HHS, 612 F.2d 594, 597 (1st Cir. 1980).  The Commissioner is responsible for resolving issues of credibility and drawing inferences from the evidence in the record.  See Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981) (reviewing court must defer to the judgment of the Commissioner).  The Court does not need to agree with the Commissioner's decision but only to determine whether it is supported by substantial evidence.  See id.  Finally, the court must uphold a final decision denying benefits unless the decision is based on a legal or factual error.  See Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (citing Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

### 3.  Plaintiff's Mental Capacity Claim

The sole issue before the court is whether the Administrative Law Judge's ("ALJ") finding, that Jenkerson had the mental capacity at the time of the first two benefits application denials to understand the review procedures, is supported by substantial evidence.  Jenkerson claims that it is not, because he suffered from a variety of generalized anxiety and depressive disorders as part of his problems with post traumatic stress syndrome ("PTSD").  He argues now that his PTSD

4

and related problems, combined with the fact that he represented himself in those applications, prevented him from understanding or availing himself of the review process.  Defendant contends the ALJ properly considered the medical record in concluding that Jenkerson understood both the denials and the effect of not appealing them and, therefore, cannot benefit now from the tolling provisions in the regulations.  The arguments proffered in support of these positions are addressed below in turn.

> a.  SSR 91-5p

Although the regulations generally require a claimant to seek review of an SSA decision within 60 days of its issue, see, e.g., 20 C.F.R. § 404.909(a) (setting forth review process of the initial determination), exceptions to this rule exist if the claimant can show good cause for missing the deadline.  See id. at §§ 404.911, 404.988 & 416.1411, 416.1488.  If a claimant cannot satisfy one of the statutory bases for reopening an application, "good cause" may still be established for having missed the deadline if the claimant demonstrates that a mental impairment prevented him from understanding and pursuing his administrative remedies.  See Klemm v. Astrue, 543 F.3d 1139, 1145 (9th Cir. 2008) (discussing SSR 91-5p); see also Boothby v.

SSA Comm'r, 132 F.3d 30, 1997 WL 727535, at *1 (1st Cir. Nov. 18, 1997) (same); West's <u>Social Security Reporting Service – Rulings: 1983–1991</u> (1992) ("West's") at 809–11 (Policy Interpretation Ruling ("SSR") 91–5p regarding "Mental Incapacity and Good Cause for Missing the Deadline to Request Review).  The regulations have been interpreted this way, because due process requires that a claimant receive meaningful notice and an opportunity to be heard before disability benefits may be denied.

See <u>Klemm</u>, 543 F.3d at 1144 (citing <u>Califano v. Sanders</u>, 430 U.S. 99, 107–09 (1977) to explain the exception to the rule against reopening when claimant's due process rights may have been violated); <u>see also</u> <u>Udd v. Massanari</u>, 245 F.3d 1096, 1099–1100 (9th Cir. 2001) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976) to explain claimant's due process rights).  If at the time benefits were denied, the claimant both represented himself and lacked the mental capacity to understand the review procedures, he may subsequently seek review of that decision based on the lack of due process surrounding the initial denial.  <u>See</u> <u>Klemm</u>, 543 F.3d at 1145; <u>see also</u> <u>Udd</u>, 245 F.3d at 1099–1100; <u>Boothby</u>, 1997 WL 727535 at *1.

    In assessing whether claimant was sufficiently mentally

6

impaired to excuse his failure to seek review of a denial, SSR 91-5p directs the adjudicator to consider the following factors:

> - inability to read or write;
>
> - lack of facility with the English language;
>
> - limited education;
>
> - any mental or physical condition which limits the claimant's ability to do things for him/herself.

SSR 91-5p, West's at 810.  "If the claimant is unrepresented and has one of the factors listed above, the adjudicator will assist the claimant in obtaining any relevant evidence.  The decision as to what constitutes mental incapacity must be based on all the pertinent facts in a particular case.  The adjudicator will resolve any reasonable doubt in favor of the claimant."  Id., West's at 811.  When seeking to reopen a previously denied application, if claimant carries the burden of proof set forth in SSR 91-5p, then the time limits for pursuing review are tolled and the adjudicator reconsiders the denial as if it were timely.  See Udd, 245 F.3d at 1100 (requiring adjudicator to further review the claim or dismiss it, as appropriate for reasons other than late filing).

        b.  The ALJ's 91-5p Holding

    As part of his third application for benefits filed on March
17, 2005, Jenkerson sought to reopen the applications that had
been denied on June 27, 1996 and April 23, 1998.  In this third
application, Jenkerson alleged a disability onset date of July
12, 1995.  <u>See</u> Certified Record ("CR") at 14.  Upon initial
review of the third application, the SSA determined that
Jenkerson was entitled to disability benefits beginning May 1,
1998.  <u>See</u> <u>id.</u>  The SSA also found no basis to reopen the prior
two applications, and Jenkerson, represented now by counsel,
sought further review of that decision by timely filing a request
for a hearing on September 26, 2005.  <u>Id.</u>  A hearing was held on
May 17, 2006, at which Jenkerson presented evidence to
demonstrate first that the earlier applications should be
reopened, and second that his disability onset date should be the
alleged July 12, 1995 onset date rather than the determined May
1, 1998 onset date (the "91-5p hearing").  The ALJ concluded the
prior applications should not be reopened and, therefore, did not
reach the second issue regarding an earlier disability onset
date.

    The ALJ concluded "[s]pecifically, during the relevant time

periods, the claimant (1) was not mentally incompetent; (2) was not diagnosed with any mental illness that would preclude him from understanding his right of appeal or to counsel; and (3) demonstrated knowledge of the procedures in his multiple filings for benefits." CR at 15. In support of those conclusions, the ALJ made the following findings. First, he determined that the record contained no objective medical evidence during the sixty day periods following the first two denials that supported a finding of any mental impairment which would have precluded Jenkerson from understanding the review procedures. Id. at 16.[1] The ALJ found Jenkerson's many acitivities particularly damaging to his claimed mental impairment. He attended classes, had primary physical custody of his daughter and expressed thoughtful concern about her welfare, was pursuing a relationship with a girlfriend and saw a therapist. The ALJ found these actions were not consistent with a person who lacked the mental capacity to pursue review of an unfavorable benefits decision.

Next the ALJ relied on Jenkerson's own statements about his

---

[1]The record reflects no dispute that Jenkerson could speak, read and write English, that his education was not an issue, and that he represented himself in the first two applications. The only question was whether he had the mental capacity to understand the review procedures.

applications, which the ALJ determined revealed that Jenkerson fully understood the SSA disability process.  Jenkerson did not allege the SSA had misled him.  He testified at the hearing that he was angered and disgusted by how the bureaucracy did not take care of veterans, which led Jenkerson to believe he was "better off out of the system."  Id. at 16.  The ALJ interpreted Jenkerson's testimony as a statement of defeat rather than confusion about how the system worked.  He also found the multitude of records from the Veterans Administration ("VA") reflective of the care Jenkerson had received and his knowledge of how to get it.  Id. at 17.  The ALJ concluded that Jenkerson's continued pursuit of benefits from both the VA and the SSA evinced his understanding of the remedies available to him.

Finally, the ALJ addressed two doctors' opinions, neither of which he found persuasive.  The ALJ determined that Dr. Michael G. Carvalho first diagnosed Jenkerson with PTSD on September 19, 2005, which reflected a change from his prior diagnoses of dysphasia.  This newly diagnosed mental impairment was more than seven and nine years after the earlier denials.  The ALJ also discounted Dr. Hans W. Standow's evaluation from March 1998. Although Dr. Standow first diagnosed Jenkerson with PTSD at that

time, he also opined that Jenkerson was well-oriented, showed
fair insight and judgment, and had average intelligence that
would have enabled him to understand and remember "even more
complex written or oral instructions."  Id.  The ALJ found these
opinions, on which Jenkerson relied to demonstrate his mental
impairment, actually undermined that claim.

As a result of these conclusions, the deadlines for seeking
reconsideration were not tolled, and the prior denials from June
1996 and April 1998 remain the final decisions of the SSA,
entitled to preclusive effect.  Jenkerson was not found to have
been disabled beginning July 12, 1995, and the May 1, 1998 onset
date remains in effect.  Id. at 18.

### c.  Evidence of Jenkerson's Mental Capacity

The only issue before the court is whether substantial
evidence supports the ALJ's finding that Jenkerson was not
mentally impaired during the sixty day time frame following his
prior denials on June 27, 1996 and April 23, 1998.  Jenkerson
challenges all three bases of the ALJ's decision.

### i.  Mental Incompetence Standard

The parties dispute whether the ALJ applied the correct
mental competency standard.  Jenkerson claims he did not need to

11

prove he was mentally incompetent as defined by the regulations, but only had to demonstrate he did not have the mental capacity to understand the review procedures, suggesting a lower level of proof.  Defendant argues this is a semantic distinction without a difference, and, in any event, the record shows the ALJ properly considered all the factors outlined in SSR 91-5p.  Under the circumstances presented here, defendant is correct and no further discussion is warranted.  See Evans v. Chater, 110 F.3d 1480, 1483 (9th Cir. 1997) (citing cases and using mental impairment, mental illness and mental incompetence interchangeably); see also Udd, 245 F.3d at 1100 (describing mental problems that "met the listing of impairments" to find claimant lacked mental capacity); Boothby, 1997 WL 727535 at *1-2 (describing evidence of mental impairments that showed claimant lacked the mental competency to pursue his claims); cf. Stieberger v. Apfel, 134 F.3d 37, 40-41 (2d Cir. 1997) (defining mental impairment "short of mental incompetency" as a heightened standard of "sufficient severity to impair comprehension," like mental illness, not mere confusion).

### ii.  Medical Records

The parties next dispute whether there is objective medical evidence that Jenkerson had some mental impairment during the

relevant time periods that prevented him from pursuing his right

for reconsideration of the prior denials.  The ALJ found there

was none, and that the opinions of Drs. Carvalho and Standow

undermined Jenkerson's claim of mental incapacity.  Jenkerson

contends the ALJ did not give proper weight to Dr. Carvalho's

opinion, which should have been afforded deference because he was

his treating physician.  He also asserts that there is nothing in

the medical records that contradicts either doctor's opinion.

After carefully reviewing the medical records on file, I find

that Jenkerson is correct and that the ALJ did not apply the

correct legal standard in reviewing the medical records.

As an initial matter, the record shows that on August 19,

2005, as part of his third application for SSD benefits, the SSA

concluded that Jenkerson met the requirements for disability

benefits beginning May 1, 1998.  See CR at 20–21.  The SSA

explained its onset date determination as follows:

> You alleged an onset date of 7/12/95.  A prior
> claim was denied as of 4/30/98.  We are not
> permitted to invade that period of time, therefore,
> we have established an onset date of 5/1/98.

Id. at 21.  This statement clearly reveals that the SSA did not

affirmatively determine Jenkerson was not disabled before May 1,

1998, but only that the SSA understood it could not consider the

13

record prior to May 1, 1998.  Whether or not the record contained evidence that showed Jenkerson lacked mental capacity before May 1, 1998, therefore, was not reviewed at the initial assessment of his third application.

The records show that Jenkerson first suffered a heart attack in 1990, and that in July 1995 he had bypass surgery for his heart condition which prevented him from continuing his former work as a painter.  See CR at 179.  He first applied for SSD benefits in April 1996, which application was denied on June 27, 1996.  The records indicate that as early as January 1996 Jenkerson was receiving psychotherapy and prescription drug treatment at the VA for his mental health problems.  See CR at 83–109 (progress notes).  The notes from January 1996 through June 1997 indicate Jenkerson sought help for his anxiety, tension and anger, id. at 108, and that he suffered from depression and stress.  Although the notes indicate he had "no evidence of psychosis" and that he was "oriented x3, memory intact," his judgment was "somewhat impaired" and he appeared and reported to be anxious.  Id. at 107.  On August 26 and 30, 1996, Jenkerson reported increased anxiety symptoms and asked to resume his therapy sessions because of his stress, anxiety and depressed

14

mood, which he identified were caused by his "experience in the
military, and especially in Vietnam," among other things.  Id. at
98 & 100.  This evidence supports both Drs. Carvalho and
Standow's opinions that Jenkerson suffered from PTSD stemming
from his experience in Vietnam.

The record reflects that Jenkerson continued to be treated
at the VA throughout 1997.  He applied for SSD benefits again in
November 1997, which application was denied on April 23, 1998
based on a finding that he was not physically or mentally
disabled.  He represented in the second application for benefits
that he was unable to work because of a heart condition,
arthritis, kidney problem, and right knee problem, none of which
the SSA determined prevented Jenkerson from working.  The SSA
also found Jenkerson's medical records "revealed that [he] ha[d]
been treated for a generalized anxiety disorder since early
1997."  CR at 35.[2]  The Commissioner found that though this
condition limited Jenkerson to a low stress work setting, he had
the capacity to understand, remember and carry out short and

---

[2]This is an error because the VA records show Jenkerson was
being treated for his anxiety disorder at least as early as
January 1996, and there are many records from 1990-94.  See CR at
110-17.  A progress note from June 6, 1991, states that Jenkerson
was depressed and described himself as being "extremely anxious
always about everything."  Id. at 111.

simple instructions and did not require any special supervision to complete a normal work day or week.  Id.  Accordingly, though Jenkerson could not return to his former work as a painter, the SSA concluded there were several other jobs he could perform.

The medical records surrounding this second denial clearly and consistently establish that Jenkerson suffered from PTSD.  On March 27, 1998, one month before the second benefits application was denied, Dr. Standow examined Jenkerson to provide a comprehensive psychiatric profile and formally diagnosed him with PTSD.  See CR at 154-57.[3]  Jenkerson "complains about depression, nightmares, flashbacks and easy irritability with temper outbursts and social isolation."  Id.  At that visit Jenkerson reported having suicidal thoughts frequently, but his responsibility for his daughter stopped him from acting on them. Dr. Standow found "there [was] certainly a great deal of evidence of anxiety and depression. . . . All in all, however, Mr. Jenkerson has shown not only evidence of anxiety and depression,

---

[3]Jenkerson described his tour of duty to Dr. Standow:
 [He] spent 1967 in heavy combat.  He saw
 people, including friends, being killed;
 handled severely wounded comrades; flew
 on numerous helicopter missions and almost
 constantly feared for his life.

CR at 154.

but certainly all the classical and characteristic symptoms of PTSD." CR at 156.

Dr. Standow's diagnosis was confirmed in April 1998 by an SSA consulting physician, Dr. Craig Stenslie. Dr. Stenslie reviewed Jenkerson's VA records and Dr. Standow's report and found the records showed Jenkerson suffered from a generalized anxiety disorder and PTSD, which had been treated on an outpatient basis by the VA. CR at 158-59. Dr. Stenslie gave Dr. Standow's report the greatest weight because it was "the most complete and recent report, although it [was] more or less consistent with the rather sketchy records from the VA." Id.

These two opinions are also consistent with Dr. Carvalho's diagnosis of Jenkerson. The record contains many treatment notes from Dr. Carvalho, beginning in 1997 through 2005. CR at 365-83; 390-407. Dr. Carvalho noted as early as August 19, 1997 that Jenkerson suffered from a generalized anxiety disorder. See id. at 405. The record is replete with notes that Jenkerson suffered from an anxious affect and depressed mood, and was being treated by Dr. Carvalho with medications and therapy, in varying amounts at different times over the years, to help his mental health. In January 2001, Dr. Carvalho notes:

17

> Has not been seen by this clinician x over 2
> years; attempted to resume therapy last March
> and did not seem to reconnect at that time.
> Long standing hx of generalized anxiety disorder
> with anger and irritability most prominent;
> this is getting worse x past year despite
> buspirone rx which seemed to work at the beginning
> of therapy.  He also had developed some depressive
> sxs of mood depression, decreased interest in
> activities, sleep is disturbed, concentration poor.
> No active suicidal thoughts but has some passive
> death wishes.

CR at 379.  At that time, Dr. Carvalho again described a

generalized anxiety disorder.  Id.  These notes reflect a

consistent diagnosis of trouble with anxiety, depression, and

stress, that was being treated by Dr. Carvalho during the sixty

day period, and much longer, following the April 23, 1998 denial.

As this record demonstrates, the ALJ erred in finding that

Dr. Carvalho first diagnosed Jenkerson with PTSD on September 19,

2005.  See id. at 17.  While Dr. Carvalho may not have previously

used the term PTSD, he repeatedly described Jenkerson's condition

consistently with the characteristics of PTSD identified by Drs.

Standow and Stenslie.[4]  The ALJ found "a recent diagnosis change

from dysphasia to PTSD despite no prior diagnosis of the same at

---

[4]The ALJ stated that Dr. Carvalho actually ruled out PTSD in
contemporaneous treatment notes; however, my review of the record
does not support this finding.

18

any relevant time." Id.[5]  That conclusion simply is not

supported by substantial evidence in the record, which reflects

that Jenkerson had no difficulty with speaking but had great

difficulty coping with stress and anxiety.  In September 2005,

Dr. Carvalho provided an historical opinion of Jenkerson's mental

health problems, see CR at 459-63, concluding that his PTSD was a

"major factor in preventing him for pursuing his Social Security

Disability appeal in May and June of 1998." Id. at 459.  Dr.

Carvalho explained his VA treatment had been fractionalized

because of staffing problems, which frustrated Jenkerson and

exacerbated his anxiety problems.  Id.  Dr. Carvalho's opinion

should have been accorded controlling weight, as he was

Jenkerson's long-standing treating physician and his opinion is

consistent with the other evidence in the record.  See 20 C.F.R.

§ 404.1527(d)(1-6) (listing how medical opinions are evaluated);

see also Pariseau v. Astrue, No. CA 07-268 ML, 2008 WL 2414851,

at *4-5 (D.R.I. June 13, 2008) (discussing weight of treating

---

[5]It is unclear where the ALJ got the term "dysphasia,"
because he does not support that finding with a cite to the
record.  The term dysphasia means difficulty with speech, see
www.webmd.com, or "any aphasia  which does not produce complete
abolition of the facility to use language." Blakiston's Gould
Medical Dictionary at 419 (4th ed. 1979).  Dr. Carvalho did
describe Jenkerson as suffering from dysthymia, which is a
despondent mood or depressive tendency.  See id. at 420.

physician's opinion); SSR 96-2p (weighing treating physician's opinions).

Nothing in the record contradicts this consistent pattern of PTSD-related symptoms.  Despite these medical records, the ALJ concluded that Jenkerson had the mental capacity to understand the review procedures because Dr. Standow had found that he retained the ability to follow complex instructions, was well-oriented with conventional thought and average intelligence. See CR at 156-57.  While those mental faculties may have resulted in Jenkerson having a residual functional capacity to do some type of work, see e.g. id. at 158-59, they do not necessarily indicate he had the mental capacity to pursue the administrative review procedures.  As discussed above, the record contains overwhelming evidence that Jenkerson could not handle stress, was easily frustrated and abnormally irritable.  See id. (Dr. Stenslie's opinion on the limited work environment he would need).  At a minimum, his PTSD raises doubts about how he would have handled a second denial for benefits.  SSR 91-5p requires that any reasonable doubt be resolved in favor of the claimant. Though this case may present a close call, given the record evidence of PTSD and Jenkerson's pro se status during his second

application, the ALJ was required to give him the benefit of the
doubt and simply reconsider whether the denial was appropriate.
See Udd 245 F.3d at 1100 (reversing ALJ who "applied an incorrect
legal standard and failed to resolve doubts in favor of the
claimant").

### c.  Demonstrated Knowledge of Procedures

Finally, the ALJ determined that Jenkerson's testimony at
the 91-5p hearing and the multiple records of his benefits
applications filed with both the SSA and the VA were evidence
that he had the mental capacity to pursue the administrative
review procedures.  While I agree with the ALJ that the record
contains ample evidence of Jenkerson's attempts to seek benefits
from the VA and the SSA, his repeated efforts demonstrate his
misunderstanding of the system more than they reflect his
knowledge of how it worked.  If he actually understood the effect
of not seeking review of a denial, then he would not have pursued
either the second or the third benefits applications.  Again, the
record raises doubts about what he understood when, and SSR 91-5p
requires that all reasonable doubts be resolved in Jenkerson's
favor.

The ALJ found persuasive Jenkerson's admission that he was

angered by the system and thought he would be better off out of it, because "the bureaucracy" does not take care of veterans. See CR at 16-17.  The ALJ concluded that Jenkerson's statement combined with the multiple records of medical care he had received from the VA evinced a deliberate choice on Jenkerson's part to walk away from the rights he had to obtain review of the benefits decisions.  Although I am not persuaded by Jenkerson's current argument that his testimony reflects delusional thinking, I am also not convinced that the ALJ fairly interpreted the testimony in the context of Jenkerson's medical history.

The record is replete with evidence that Jenkerson was frustrated by "the system" and his perceived unsuccessful efforts to get help.  The progress notes from the VA indicate he was concerned about his therapist leaving him and not wanting to continue with someone new.[6]  In the summer of 1997, between his first and second SSA applications, Jenkerson applied for "Compensation and Pension" benefits from the VA because of the "unusual stress disorder" caused by the tension from his combat service that he believed contributed to his heart condition.  See CR at 173.  After Dr. Standow diagnosed Jenkerson with PTSD,

---

[6]That concern is legitimized by Dr. Stenslie's observation that the VA records were "sketchy."

Jenkerson notified the Department of Veterans Affairs seeking
verification of the combat experience he remembered from his
service in Vietnam.  <u>See</u> <u>id.</u> at 160-61.  He was notified on April
28, 1998 that his request for documentary proof of his combat
experience would take approximately six months to process.  It is
entirely reasonable that Jenkerson believed he could not
challenge the April 23, 1998 benefits denial without some
documentary proof of the PTSD, which he learned on April 28, 1998
that he would have to wait six months to receive.

In January 1999, Dr. Valdez examined Jenkerson as part of
his VA Compensation and Pension benefit application.  <u>See</u> CR at
178-80.  Dr. Valdez also concluded Jenkerson suffered from PTSD,
opining:  "this patient has been suffering from PTSD for some
time now.  He just did not know how to get help for it nor did he
know that he could get Compensation and Pension for it."  <u>Id.</u> at
180.[7]  Despite that opinion, the VA denied Jenkerson's

_____

[7]Dr. Valdez observed and noted several problems consistent
with Drs. Standow and Stenslie, about Jenkerson's anxiety levels,
irritability, inability to succeed in social relationships, and
significant fear stemming from his experience in Vietnam, which
haunted him to that day.  Dr. Valdez gave Jenkerson a "Global
Assessment of Functioning" ("GAF") score of 50.  <u>See</u> <u>Tindal v.</u>
<u>Astrue</u>, No. 3:06-cv-1095-J-TEM, slip op., 2008 WL 725552, at *4
n.4 (M.D.Fla. Mar. 17, 2008) (describing GAF score ranges that
rate a person's psychological, social and occupational
functioning level, with 50 falling in the 'serious symptoms'

application on February 3, 1999 because the army's records could
not establish the March 1967 night-time ambush Jenkerson
identified as the "inservice stressor" that caused his PTSD.  Id.
at 147-49.  The record indicates that Jenkerson disagreed with
that decision and obtained a second consideration, but was again
denied benefits on June 11, 1999 because of the "absence of
verified stressful events."  Id. at 138-43.  He did not pursue
any further appeal.  Id. at 138.

     While this evidence shows Jenkerson was capable of applying
for benefits, it also suggests why Jenkerson would have felt
frustrated and defeated by the system.  Despite his reported
upset from his combat experience in Vietnam, the army's response
was that his "stressor" was unverifiable.[8]  He did not appeal the
VA denial, as he had not appealed the SSA denials.  That he had
the mental capacity to persevere with his benefits claims but
simply elected not to do so is not supported by substantial
evidence in the record.  He was as likely to have had the mental

range).

     [8]The record contains a report on the 129th Assault
Helicopter Company in An Son, Vietnam during 1967, which is the
unit and location where Jenkerson served while in the army.  CR
at 176-88.  That report details the unit's assault missions and
substantiates Jenkerson's reported combat experience.

24

capacity as he was not, and in such equivocal circumstances, SSR 91-5p requires that doubt should be resolved in Jenkerson's favor.

Conclusion

For all the reasons set forth above, I find that Jenkerson had good cause for not timely seeking review of his June 1996 and April 1998 disability benefits application denials and that due process requires those prior two applications be reopened.  I recommend, therefore, that Jenkerson's motion to remand (document no. 14) be granted.  On remand, the Commissioner shall reopen Jenkerson's prior applications and consider the merits of the April 1996 and November 1997 benefits applications to determine whether or not Jenkerson's disability onset date is July 12, 1995 as he has alleged.  After such further review, the Commissioner shall recalculate what, if any, additional benefits are due Jenkerson, which decision shall be subject to further administrative or judicial review as provided by law.  See Udd, 245 F.3d at 1102 (explaining procedures for reviewing reopened SSD benefits applications); Boothby, 1997 WL 727535 at *2 (addressing the merits of the application after the due process violation is decided).

25

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See</u> <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).



_____
James R. Muirhead
United States Magistrate Judge


Date:  May 26, 2009

cc:    Jeffry A. Schapira, Esq.
       Gretchen Leah Witt, Esq.

26